Thank you, Your Honors. David McCauley representing Mr. Pascua. May it please the Court, I would like to reserve one minute for rebuttal. I've represented most of the members of the Marcos Encourage that were here in Hawaii. Their cases have reached the Ninth Circuit. I've spoken with the Court about them in the past. It's always been a pleasure to do so. Mr. Pascua is the last of these. He's now 73 years old. He was brought here in 1986 along with the other members of the Marcos group. As the Court knows, they were brought here aboard U.S. military aircraft. They didn't seek to come. They thought they were going to Marcos political stronghold in Ilocos Norte. The fact that we brought him here and that he didn't seek to come is probably what makes his case unique in terms of the relief that might be available. As you know, he's asked for relief in the form of asylum. There's can change circumstances in the Philippines, whether that's a viable claim anymore, particularly in light of the fact that Imelda has gone back. Other members of the Marcos family have gone back. Has there been any attempt to mediate this case through the Ninth Circuit? There hasn't been any attempt to mediate. Nothing whatsoever has been done in that regard. I think if it were possible to do so, that might be advisable. I mentioned in our brief a case that came up within the Ninth Circuit, got a lot of publicity. That was the Save Tess campaign, the matter of Tess Hupanda, where in the end, the government did agree that she should be granted indefinite parole, and she remains in the United States in parole status. That would certainly be a satisfactory resolution for Mr. Pascua if there were a way through mediation to come to that sort of understanding. Is there no other status that these folks can be adjusted to out of parole? Most of the others actually have managed adjustment through family members. Mr. Pascua has no family members in the United States. So married to a U.S. citizen or something like that? One of the other, I was meeting with one of the other members of the entourage yesterday, and they asked about his case. And I said, well, he's coming up for Ninth Circuit today. And they said, well, we've always told him he should find a lady. It wouldn't be the first. It wouldn't be the first. My sense, knowing Mr. Pascua, is that his wife passed away about 15 years ago. He did take advance parole to go back for her services. And I think in his heart, there probably isn't any other woman. And he certainly is not the kind of man who would do it simply to be able to stay here. Well, if that's the case, I guess the issue I'd like you to help me with is, I have always understood parole to be purely at the discretion of the Attorney General. And in this case, apparently, the justification was obviously matters that were in the interest of the United States at the time that the Marcos regime fell. But I've also understood that the law is that the Attorney General can basically revoke that parole status at any time. And is there any legal reason why the Attorney General can't do that with regard to Mr. Pascua? No, there certainly is not. And in fact, that's exactly what happened in 1992 after President Marcos passed away. They did revoke the parole for all the remaining people here. They then all submitted asylum applications. And in the majority of cases, there were a few of those asylum applications in the early days that were granted. For some reason, the majority of the others were not. And the result in those cases has been because of changed circumstances. Do you have an argument that I don't fully understand that I'd like to hear explicated that he should have been accorded refugee status rather than parole status at the outset, or that there was some problem with regard to the way he was treated at the outset? I don't really fully understand it, except that there's some regulation that essentially says that you shouldn't be using parole as a substitute for refugee status. Well, the government has addressed that. We submitted that they certainly were in the status of refugees because of the fear of persecution by the incoming government on account of their relationship politically with Marcos. The government does have the option of electing to parole people rather than admit them as refugees. And it would address their political concerns. And as the government has argued, their position is that's why parole status was used in this case. It's as if the United States government wanted the option of saying, okay, we don't need you here anymore, if the day should come that they felt they didn't need them here anymore. Now, in terms of equity and justice, whether that's fair. At the time of the original parole grant, was there a determination in any form that this was in the public interest or whatever language one's supposed to use, the government's supposed to use for that? That is exactly the language that was used. And, in fact, on the I-94 cards they were given, some of them it was written parole in the public interest, some of them it was written humanitarian parole. It was inconsistent, but it appears that it was indeed all parole. But here, there is such a card in this case? It is certainly in the file, which is an extensive file, but they were paroled in the public interest. I think. Because the I-94 form itself doesn't seem to say that. Most of the I-94 cards for the people in the Marcos group. Oh, it does say public interest, purpose public interest. They're almost all annotated that way. In any case, the concern, I guess, that I have for Mr. Pasqua is, of course, we would like the court to find that he is deserving of relief in the form, perhaps, of asylum. If he were sent back, he's a 73-year-old man, he certainly can't afford the protection and the bodyguards that Imelda and her family and the people of that age can afford. The problem with that is that we've got a finding by the immigration judge that there is not a substantial risk of future persecution because of changed country conditions. So, we don't really, we don't have the power of the Attorney General to direct a finding of asylum unless we conclude that substantial evidence compels the contrary. So, other than doing it out of the goodness of our heart, what's our legal justification for giving you the relief? The legal justification for granting him asylum would be a finding that the judge was in error, that he really would face, that he does have a well-founded fear of persecution. He has family there now, right? He has some brothers and sisters and he has, I believe, two adult children. And I don't know that they have suffered, but again, they were not associated with Marcos in the way that Mr. Pasqua and other members of the Marcos entourage were. Mr. McCauley, if we were to deny your application at this point, as soon as that becomes an order of the court, I guess, if that were to occur, I suppose that Mr. Pasqua could simply be taken by the INS or Homeland Security or whoever it is out of this country and put on a plane to the Philippines. What would you do? Could you move or request the Attorney General to exercise his discretion in your favor? Do you need an order to give time to get that done? What would you do? Well, if the court found that there is no relief that is available, then that would have to be dismissed. What would happen in Mr. Pasqua's case is he would be taken into a federal detention center until such time as they can procure a passport for him, appropriate travel documents. Probably three or four weeks would be my guess. He would essentially be incommunicado. He has no family members here that could visit him. So if that were the case, we would ask that he at least be afforded the opportunity to make a graceful departure and that might be accomplished if the court were to say, we regrettably must dismiss this and during that 30 days, I would guide him in making arrangements and I would work with the local... Does he have a voluntary departure order? Because he was under exclusion proceedings, voluntary departure is not available. But I thought, I wondered about that because the Bona case seemed to hold, throw some question as to that rule, didn't it? Well, this is the second prong of our argument with regard to a graceful departure and that is that he should be afforded voluntary departure on the ground that he is not an arriving alien because by the plain wording of the statute, and my time is about to expire with my reservation of one minute, it's somebody who is coming or attempting to come into the United States which suggests that it must be, there must be some element of volition. He had no intention of coming to the United States. He was brought here not knowing that the plane was flying to Guam and not to Ilocos Norte. So we've argued it's inappropriate to call him an arriving alien for whom voluntary departure would be prohibited also on the grounds that that concept did not even exist in the law at the time that he came in. So what we're hoping for... Presumably, he could have voluntarily gone someplace else from Guam, could he not? No. The plane was an American military plane, brought them into Guam. They were initially evacuated by helicopter, so I have to assume that they had to change aircraft to some sort of a fixed-wing airplane in order to get to Hawaii from Guam. They were evacuated to Clark Air Force Base and in the middle of the night... And switched to a different plane. In the middle of the night, they were called. So my question then is, if he had wanted to, at that point, could he have said, look, I would rather go back to my home province or... No, none of them had any choice in the matter. They were essentially in U.S. military custody and they were being brought to Hickam Air Force Base. They couldn't have said, I want to go somewhere else. But he could have left once he arrived in Hawaii, could he not? There wasn't anything that was restraining him from leaving Hawaii. Probably the economics, being able to find a way out of here. They had, in the most cases, no passports, so being able to get a visa to go somewhere else, I think... But obviously, he wanted to stay in Hawaii because he made his life here. Well, none of them elected to go back. That's correct. Okay. Thank you. Thank you very much. This is Drucker. Good morning, Your Honors. May it please the Court? My name is Allison Drucker. I'm representing the United States. Well, we do agree with the proposition that there is no relief available to petitioner in this case. There is no claim that was put before the BIA or this Court about past persecution. We believe that substantial evidence overwhelmingly supports the determination of the IJ and the BIA of no well-founded fear in this case. Is it the case that other people similarly situated have been allowed to remain aside from adjustment of state? There were some relatives of General Verr, General Verr being very prominent politically in the Philippines, who were able to get asylum. But was there at least one person who, on the basis of this letter, which has been introduced into this record too late, about indefinite parole, been allowed to stay on indefinite parole? I know that there was a settlement in, I think it's called the Hupanda case. So is it worth mediating this case? Does it make sense to have this one guy? I understand that he didn't introduce this letter into the record, but nonetheless, if you have two people exactly similarly situated, would it not make sense to talk about whether they should be treated the same way? I don't know all the facts of the Hupanda case, so I can't really say whether they are totally similarly situated. Is it worth finding out by going to some mediators here? I think the government's position in this case that's before you is that there's no relief available, and that's the position I intend to argue before you. I understand that, but I'm asking you a different question, which is if it turned out that in Would the government entertain the possibility of allowing him to stay in the same terms? Possibly. Okay, go ahead. The petitioner admits that the government issued parole documents. The parole documents were for a temporary period of time, and the whole intent of parole, as shown in the statute which hasn't changed much since the time that this petitioner arrived at the United States, and the regulations interpreting the statute show that the intention is temporary. He was paroled in for these purposes that had to do with basically foreign relations, and when the time when that was required had passed, he received a revocation of parole letter which stated that he had been paroled in connection with the Marcoses as a matter of public interest, and in light of the death of President Marcos and the voluntary return of Mrs. Marcos, it has been determined there is no longer any need for the further exercise of the Attorney General's parole authority. I have a question. Does the government, is your position that the government, faced with someone who might be eligible for refugee status, has a complete option to not consider them for refugee status, but instead parole them indefinitely? And if so, could he then have applied for refugee status, say back in 86, but just didn't? He was paroled, right? Right. Which was a temporary status. Could he have applied for asylum once he got here immediately? I believe so. I believe he could have done that. As to your first part of your question, as to whether the government, the scope of choice, I guess, is what you're saying. Right, that's right. As for the government making a decision between, choosing between parole and asylum, well, I'd like to point out a couple of things. First of all, the part of the statute that he relies on, which is 1182 D5B, I think, that talks about refugee status. Now, refugee status, excuse me, it talks about admitted as a refugee under Section 207. Now, refugee status under 207 is something that's given abroad, and so on the face of the statute, it should be read as applying to people who've already received refugee status abroad, and then they've subsequently arrived and are seeking to enter the United States. That's not the case here. A second- Well, this is a fairly sui generis case. I mean, there cannot be very many people who arrive under circumstances similar to the Marcos entourage, are there? Well, that's probably true. I mean, the only experience I have with parole is where we parole aliens into the United States for purposes of criminal prosecutions, where they're named in indictments, and so we parole them in order to admit them to come in and answer a case. Well, other people are sometimes paroled in for medical reasons, for example. Okay. That would be another example. But it's the same statute, right? Yes. The same general parole statute. Right. That's right. I think also to the effect that he's challenging the decision to parole a petitioner in rather than to give him asylum initially, there's a presumption of administrative regularity under Citizens to Preserve Overton Park that would come into play. And then thirdly, the parole revocation letter, which I was just reading from a moment ago, this is at page 326 in the record, just by its language shows that, in fact, there was a compelling reason to the public interest that were tied up with these petitions. But that was after the fact, so that's not very useful. I'm sorry? That's well after the fact, so it's not terribly useful. In other words, it's a statement that was years after it happened. But there's a little line on the I-94 that says public interest, whatever that means. Well, that's further support for what I'm saying. I mean, I personally think that the first sentence on page 326, it talks about the purposes of the parole as it was initially given. So I do feel that that is relevant. Your point essentially is that the letter simply reminded him that he was admitted in the public interest but that the Attorney General had now determined that that reason had terminated or expired, and therefore his status was being revoked. Isn't that what the purpose of the letter is? Yes, the purpose of the letter is to tell him that now that need no longer exists. I mean, to put it in a less legal sense, this whole issue of parole is essentially a matter of grace by the government that will allow you to come in for some reason. And the letter is telling him that the reason we let you in is no longer effective, and you have to leave. And it's all intended to be temporary from the get-go. But where do you get the, as to 12, what is it, 12, the section we're just talking about, I can't figure out what the section is, but the one that says that the Attorney General may not parole a United States alien who is a refugee unless he determines that compelling public interest requires that he be paroled rather than admitted as a refugee. Where do you get the notion that he has to have been already adjudicated a refugee? Refugee is a status with a definition in the statute, right? And a refugee is defined in a way that doesn't depend on him having already been determined to be one. Okay, I believe section 207 deals with these determinations when they're made abroad, and then section 208, which is 1158, is, you know, about asylum, when people are here in the United States and they're seeking asylum. That's right. I don't have it in front of me, but my recollection is that there is in the statute a definition of refugee, the word refugee. And it doesn't depend, it depends not on where they are determined to be one, but what their situation is. That's true. So when it says an alien who is a refugee, I don't see how that depends on him having already been adjudicated a refugee. Well, I guess it's just a question of how you interpret that phrase, who is a refugee. I would interpret it in accord with the definition in the statute of refugee. Well, speaking as the representative of the Attorney General, I would say, you know, that would be something for the Attorney General and those who are designated to make decisions on his behalf to apply that, that someone isn't a refugee until the Attorney General says they're a refugee. And that there's a completely separate statutory scheme to make that determination, 1157. Yeah, right. Parole is not intended to apply to a normal person who is seeking refugee status under 1157. And that gets back to the question I asked you before. This is kind of a sui generis case. You don't see them very often, but here we are. Now, Mr. McCauley suggested that if we were to dismiss the petition for review, that Homeland Security would take Mr. Pasqua, who as far as I can tell has been a perfectly wonderful resident in his custody, and that we wouldn't let him out on any kind of bond? I'm not sure where that's coming from. I mean, that's not my understanding. I mean, normally people are allowed to post bond, at least unless they're like aggravated felons or something of that nature. After a final order of this court? I think in this situation he would be able to bond out. And we're talking about a pretty nominal bond, right? $500, $1,000, something like that? Again, I think in this situation my client would be willing to be rather generous-spirited. He hasn't hit the profile of a frightening lawbreaker kind of person. We certainly recognize that. Okay. Is there anything else you want to say? No, Your Honor. Just again, I guess just to sum up, that there's no past persecution. There's no substantial evidence supporting well-founded fear. There hasn't been any showing. I mean, there was also in the brief. Can I ask one last question? Was this argument about the relationship between refugee status and parole status made before the BIA and before the IJ? I believe that before the BIA, Petitioner did raise this point. There was a question whether his client, or excuse me, Petitioner, should have been admitted as a refugee rather than parole. And before the IJ as well. I think there's that exhaustion problem. I don't really remember exactly whether that came up before the IJ. I'll ask Mr. McCauley as well. Thank you very much. You're not contesting that he hasn't exhausted, is that right, that issue? No, no, I'm not. But again, I don't think he has any options. In the brief, there was a theory about affirmative misconduct to stop the government. I don't think there's any basis for that. And I don't think the government did anything wrong in deciding initially to parole him instead of treating him as a refugee. So the court should affirm the BIA and deny the PFR. Okay, thank you very much. Mr. McCauley, we'll give you a minute. Very briefly, Your Honors, because I did exhaust my time. We have about 30 seconds earlier. I've been a practicing immigration attorney in Honolulu for nearly 15 years. I have never seen a case in which the Department of Homeland Security or the legacy INS was willing to release someone on bond who was under a final order of deportation. If they were to do so, they would want a huge bond. They would want $10,000 or $20,000 or more because anybody under a final order of deportation, their view is and perhaps most of us agree. We've learned that the net result of all of our orders is that something like 13% of the people are actually deported after we're done. Because if they're released on bond, they run away. Or they don't find them or whatever. I have a question about your argument about the refugee and parole status. It's an interesting argument. Isn't that many years too late? I mean, why should not that have been raised at the time? In other words, when he got here and he was paroled rather than made a refugee, he could have applied for refugee status. And if they said, no, you're on parole, he could have contested it then. But how does it come up now? Well, no one ever. I don't think they were advised as to their options in terms of applying. Well, they were advised that they're on parole, and they were advised that it was indefinite, and it had to be renewed, and they were advised that it was, quote, public interest. So how can you now complain that he should have been originally a refugee, which is really what you're saying? Under U.S. immigration law, if a person was, in fact, a refugee, they remain a refugee. And the position that we've taken is, no, he didn't. There wasn't even time for them to go through State Department procedures to get an adjudication of refugee status. But they were, at the time, and the historical record supports this, the Secretary of State, President Reagan, they were all working together to decide what to do, and they made the executive decision at that level to bring these people out. And our argument is that bringing them out under those circumstances was bringing them out as refugees for fear of what would happen to them under the incoming government. But I don't think that's a question Judge Berzon's asking. The question is, isn't it true that as soon as he arrived in Honolulu, he could have filed an application for asylum at any time? That's correct. At that time, they could have all submitted applications for asylum. They didn't do it until some years later. Okay. Thank you very much. The case of Pascua v. Gonzales is submitted. The case of Cruz-Riveras v. Gonzales will be argued next.
judges: Thompson, Berzon, Tallman